***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Young, the pre-hearing record compiled by Deputy Commissioner Phillip Holmes, the records contained in the Commission's file in this matter and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner's denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between the plaintiff-employee and defendant-employer at all relevant times herein.
3. Liberty Mutual Group was the carrier on the risk at all times relevant herein.
4. The parties stipulated to plaintiff's medical records from Carolinas Healthcare System, Carolinas Medical Center, First Charlotte Physicians, and Southeastern Orthopaedic Evaluation Centers, P.C.
5. The parties stipulated to Industrial Commission Forms 18, 61, 33, 33R and 22, to plaintiff's recorded statement dated October 28, 1999, to discovery requests and answers and other personnel documents.
6. The issues presented are:
 a) Whether the plaintiff sustained an injury by accident while in the course and scope of employment with defendant-employer.
 b) Whether the plaintiff is entitled to any benefits under the North Carolina Workers' Compensation Act.
 ***********
Based upon all the evidence of record and reasonable inferences therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 37 years old.
2. Plaintiff began working for AutoNation on January 4, 1999 as a front-end loader sanitation truck driver. AutoNation operates a trash pickup service known as Garbage Disposal Service (GDS). Plaintiff initially drove a trash truck along a route assigned to him. On the date of his injury, however, plaintiff had been reassigned to "swing" duties and was driving a route for another driver who was on vacation.
3. On the morning of October 13, 1999, plaintiff clocked in at approximately 3:40 a.m. and took the truck, which was fully loaded from the previous day, to the dump. At 5:00 a.m. he began the process of dumping the truck, which took approximately ten minutes. The dump is on the 1-85 Service Road near Graham Street on the north side of Charlotte.
4. Plaintiff picked up a couple of dumpsters in the northern part of town then proceeded to the southern part of town, near Westinghouse Blvd., where he began picking up other dumpsters. After he had picked up approximately four or five dumpsters, he came to the dumpster at Southern Staircase. This dumpster was overflowing. Using the front-end loader on the truck, he picked it up a few inches off the ground and then slammed it back down on the ground, so that the refuse inside could settle. He then lifted the dumpster up over the truck to dump it into the hopper on the back. When he did so, some of the refuse in the dumpster landed on top of the cab and the deck on the front of the hopper. After he put the dumpster back down, he used a ladder on the front of the truck and climbed up to the top and while in a "bending over" position began tossing the garbage on the top of the cab and the hopper deck into the hopper.
5. His foot slipped. He fell off the truck, falling approximately ten to thirteen feet to the ground, landing on his buttocks and back and also striking his head. It knocked the breath out of him and he lay there "stunned". Apparently no one saw him fall, but a worker from Southern Staircase had seen him on top of the truck and then saw him on the ground and the worker came over to check on him. Someone called an ambulance to pick him up and he was transported to Carolinas Medical Center emergency room. Both the emergency room records and the ambulance report are contained in the stipulated medical records. His paperwork at the emergency room indicates that it was generated at "8:48 a.m." on that day.
6. Plaintiff was treated for his injuries and was released with instructions not to return to work for at least two days. On October 15, 1999 he reported to First Charlotte Physicians, seeing Dr. Villier, who diagnosed a lumbar strain and kept plaintiff out of work. At a subsequent visit, Dr. Villier kept plaintiff out of work through November 4d' when he was scheduled to see a doctor arranged by defendants.
7. On November 3rd, at the behest of defendants, plaintiff saw Dr. Stephen Shaffer, an orthopedic evaluator. Dr. Shaffer noted the lumbar complaints and strain and recommended follow-up treatment with an orthopedist.
8. Plaintiff reported back to work on November 9, 1999 at approximately 6:00 a.m. He reported to work that day expecting to be placed on a "roll-oft" truck for training. However, after about 45 minutes, the roll-off driver with whom he was to ride had not appeared. Instead, a supervisor, Mark Mitchell, took him in to see the general manager, Dave Bevacqua. Both Anderson and Bevacqua testified about the conversation. Taking into account the cross examination of Bevacqua, at which time he clarified certain crucial aspects of the conversation, the conversation apparently went something like this:
 Bevacqua:I need to talk to you about events leading up to your injury.
 Anderson: I can't answer any questions about that. I need to check with my attorney before I answer about that.
Bevacqua: Are you refusing to answer my questions?
 Anderson: No, but I need to check with my attorney first.
Bevacqua: Are you refusing to answer my questions?
Anderson: No, I just need to check with my attorney.
 Bevacqua: Well we don't need you around here any more. Go on home and don't come back on the premises, if you do, I'm going to call the Sheriff.
Anderson: Am I being terminated?
 Bevacqua: [No answer] [The parties stipulated that plaintiff was terminated on November 9, 1999.]
9. The Full Commission finds that plaintiff's termination from his job was related to his compensable injury. The Full Commission finds Bevacqua's testimony to the effect that plaintiff was fired because of customer complaints and poor job performance incredible. Deputy Commissioner Phillip Holmes, who presided over preliminary matters in this case, should have admitted the tape recording of the conversation between Bevacqua and plaintiff. Defense counsel objected to its admission on ground that the tape was "illegal." At oral argument such counsel could cite no law to back up the position that the tape was "illegal" and could not distinguish video surveillance tapes, which are routinely admitted into evidence in practice before the Industrial Commission. The Full Commission draws the inference that this tape was favorable to the plaintiff and unfavorable to defendant, since plaintiff wanted it admitted into evidence and defendant opposed admission.
10. On direct examination Bevacqua testified that he had wanted to talk with plaintiff about "service issues," that is, issues involving plaintiff's service to customers. However, on cross-examination, Bevacqua admitted that although talking with plaintiff about "service issues" was his intention, he did not tell plaintiff that when the conversation began, but only told plaintiff that he wanted to talk to him about events leading up to his injury. Bevacqua admitted on cross that he had never discussed the "service issues" with plaintiff prior to firing him.
11. Following his termination from GDS, plaintiff drew unemployment compensation from mid-November, 1999 through early April, 2000. With the exception of two weeks, the amount he drew was $356.00 per week. On the other two weeks he drew a lesser amount. The fact that he was awarded unemployment means that GDS was unable to `prove cause in his discharge.
12. Although plaintiff did have a prior history of injuring his back and other accidents during the time that he worked for GDS, he had not experienced any symptoms from those previous back injuries until the day he fell off the truck. Plaintiff received a new back injury on October 13, 1999 when he fell off the top of the truck. The primary injury he sustained was a back strain or sprain.
13. Following the denial of his case and the termination of his employment in November, he was unable to get any further medical treatment due to lack of insurance or resources. However, he continued to have strong symptoms for approximately a month and a half following that termination. He continued with periodic symptoms thereafter. He was never provided the orthopedic attention recommended by Dr. Shaffer on November 3, 1999.
14. Plaintiff attempted to return to work for another sanitation company, riding on the back of a truck for Action Garbage. After a week he found that trying to stand on the platform and hold on to the truck exacerbated his back symptoms any time the truck went over a bump or a dip. This evidence supports a claim for lost earning capacity compensation under N.C. Gen. Stat. § 9730. He had been written out of work by treating physicians and then, following November 9, 2001, he was unable to earn wages because of a combination of injuries and because of his wrongful termination resulting from his compensable injury.
15. He subsequently found work with Avis Rent-A-Car as a courtesy bus driver, beginning April 19, 2000 for $8.50 times 40 hours, and receiving a raise not long before the September 25, 2001 hearing to $9.50 per hour for 40 hours. An employee's wages upon return to work following an injury are "strong but not conclusive evidence" of his earning capacity [under N.C. Gen. Stat. § 97-30]. Hendrix v. Linn-Corriher, 317 N.C. 179,189, 345 S.E.2d 374 (1986). Here, plaintiff attempted to return to work in the industry in which he was injured, found that it exacerbated his injury, and had to take lower paying, less-strenuous work. He has proven his claim for benefits under N.C. Gen. Stat. § 97-30.
16. The Form 22 shows an average weekly wage of $810.56, which provides a compensation rate of $540.40. The Form 22 shows 283 days of earnings, not the "304" handwritten on the form. Plaintiff is entitled to temporary total disability from October 13, 1999 through April 18, 2000, inclusive. Plaintiff did perform the job search required by the Employment Security Commission while he was receiving employment benefits. Defendants failed to carry their burden of proof that the termination from employment justified a termination of indemnity benefits. See, Seagraves v. Austin Co., 123 N.C. App. 228 (1996).
17. Most of the evidence from defendants consisted of depositions of Dr. DuPuy and Dr. Van Der Veer. Neither Dr. Van Der Veer nor Dr. DuPuy treated plaintiff for the injury that is the subject of this case. However, Dr. DuPuy treated plaintiff for a previous, unrelated injury two years before, in 1997. Dr. DuPuy felt that plaintiff was suffering some emotional problems at that time. Dr. DuPuy testified that his colleague Dr. Moorefield had seen plaintiff in 1998 for another injury, and based on Dr. Moorefield's notes in the Charlotte Orthopedic Specialists chart, Dr. DuPuy found no indication that plaintiffs emotional problems had continued into 1998.
18. Dr. Van Der Veer saw plaintiff on two occasions in 1997 and found plaintiff to be "hostile" during the exam. However, Dr. Van Der Veer saw plaintiff during the same period of time that Dr. DuPuy testified was a period of emotional problems for plaintiff. As noted above, plaintiffs emotional issues had apparently resolved themselves by 1998, at least a full year before the accident that is the subject of this case.
19. The content of both the DuPuy and Van Der Veer depositions is irrelevant to the accident and injury at issue here. The testimony regarding plaintiff's demeanor in 1997 is given little weight by the Full Commission. Plaintiff admitted at hearing that he had suffered prior accidents and back problems. The deposition evidence was adduced for the sole purpose of providing defendants with a credibility argument, since they had no other evidence to justify denial of the claim. Defendants failed to prove that plaintiff was not credible. The Full Commission finds that plaintiff was credible and that objective evidence corroborated his testimony.
20. Plaintiff sustained an injury to his back while at work on October 13, 1999, when he fell from the top of his truck while cleaning debris. Falling from the truck was an injury by accident that occurred during the course and scope of plaintiff's employment.
21. Plaintiff's counsel withdrew from the case after an unfavorable Opinion and Award from Deputy Commissioner Pamela T. Young. Plaintiff's counsel is thus not entitled to the usual 25% contingency fee. The Full Commission finds a fee of 20% to be reasonable under the circumstances.
22. The Full Commission finds that the hearing before the Deputy Commissioner was defended without reasonable ground and such defense was stubborn, unfounded litigiousness which is inharmonious with the primary purpose of the Workers' Compensation Act to provide compensation to injured employees. The records from the emergency room visit proved that plaintiff suffered an injury that day. It was unreasonable for defendant to assume that, because there were no other witnesses to plaintiff's fall from the truck, he did not fall. There were witnesses who found him laying next to the truck.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident while in the course and scope of his employment with AutoNation on October 13, 1999. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff was unable to earn any wages by reason of his compensable injuries from October 13, 1999 until April 18, 2000 except for certain wages paid by GDS and except for unemployment compensation. N.C. Gen. Stat. § 97-29. From and after April 18, 2000 plaintiff suffered compensable wage loss. N.C. Gen. Stat. § 97-30.
3. Plaintiff is entitled to medical treatments reasonably required to "effect a cure or give relief ". Defendants shall pay medical providers for such treatment or, where appropriate, reimburse those who paid. N.C. Gen. Stat. § 97-25.
4. Plaintiff's former lawyer is entitled to a reasonable fee of 20% of compensation due plaintiff. N.C. Gen. Stat. § 97-90. Inasmuch as the Full Commission has determined that the hearing before the Deputy Commissioner was defended without reasonable ground, the Commission may assess the whole cost of the proceeding, including reasonable fees for plaintiffs attorney against defendants. N.C. Gen. Stat. § 97-88.1. The purpose of this section is to prevent stubborn, unfounded litigiousness which is inharmonious with the primary purpose of the Workers' Compensation Act to provide compensation to injured employees. Troutmanv. White Simpson, Inc., 121 N.C. App. 48, 464 S.E.2d 481 (1995).
5. Defendants are entitled to a credit for unemployment benefits paid to plaintiff during part of the period from October 13, 1999 to April 18, 2000. N.C. Gen. Stat. § 97-42.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendants shall pay, or reimburse those who paid, all medical providers for service rendered to plaintiff by reason of his compensable injuries to the extent those services tended to provide relief, to effect a cure or to help to return him to gainful employment.
2. Defendants shall pay plaintiff a lump sum of $14,590.80 for the 27 weeks of temporary total disability compensation due plaintiff. Defendants shall pay directly to plaintiff's prior counsel, Bob Bollinger, the amount of $2,918.16 as reasonable attorney fees, which is taxed to defendants as part of the costs of this proceeding. Defendants shall also pay directly to plaintiff $1,055.03 in interest from the date of the hearing before the Deputy Commissioner until August 20, 2002. Defendants shall pay an additional $22.45 in interest per week for each week after August 20, 2002 until the date the entire $14,590.80 is paid.
3. Defendants shall pay to plaintiff 66.67% of the difference between $540.40 and actual wages less than $810.56 earned by plaintiff for the 300 weeks following October 13, 1999 as wage loss. Defendants shall pay directly to plaintiffs former counsel, Bob Bollinger, 20% of 66.67% of the difference between $540.40 and actual wages less than $810.56 earned by plaintiff for the 300 weeks following October 13, 1999 as attorney fees for wage loss, which fee is also taxed against defendants pursuant to N.C. Gen. Stat. § 97-88.1. All such payments to plaintiff and to plaintiff's attorney shall be made weekly as soon as plaintiff's weekly wages are determined. Excluded from these weekly payments are payments for any weeks for which plaintiff was paid temporary total disability by defendants. Defendants may deduct from plaintiff's weekly wage loss payments a credit for the actual unemployment compensation paid to plaintiff during the period of temporary total disability.
Defendants do not owe wage loss for any of the 300 weeks during which plaintiff earns $810.56 or more.
4. Defendants shall pay the costs, including expert witness fees of $325.00 to Dr. DuPuy and $335.00 to Dr. Van Der Veer and the reasonable attorney fees to Bob Bollinger heretofore described.
This 5th day of August 2002.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
DISSENTING:
S/____________ BUCK LATTIMORE CHAIRMAN